# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Dr. Jayaram Bharadwaj, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| Mid Dakota Clinic, P.C., Dr. Robert | ) | |
| Tanous, Dr. Shelly Seifert, Dr. Vijay Rao, | ) | |
| Marvin Lein, Dr. Steve Hamar, and Board | ) | |
| of Directors, Mid Dakota Clinic, P.C., | ) | |
| | ) | Case No. 1:16-cv-262 |
| Defendants. | ) | |

Before the Court is the Defendants' motion for summary judgment filed on October 30, 2017. See Docket No. 103. The Plaintiff filed a response in opposition to the motion on November 6, 2017. See Docket No. 117. The Defendants filed a reply brief on November 30, 2017. See Docket No. 132. From October of 2010, to January 26, 2015, Dr. Jayaram Bharadwaj was employed as a physician at Mid Dakota Clinic in Bismarck, North Dakota. He resigned at a special shareholder meeting called for the purpose of deciding his continued employment. In this lawsuit Dr. Bharadwaj alleges he was constructively discharged based on his race, perceived disability, breach of fiduciary duty, and in retaliation for reporting alleged illegal activity at the clinic. For the reasons set forth below, the Defendants' motion for summary judgment is granted.

## I.     BACKGROUND

Dr. Bharadwaj is 50-years old and was raised and educated in India. He began employment at Mid Dakota Clinic on October 11, 2010, and was elected shareholder in June of 2013. On November 21, 2014, Dr. Bharadwaj was suspended by the Mid Dakota Clinic Board of Directors

EXHIBIT

1

for disruptive behavior and attitudinal problems. A special meeting of the shareholders was scheduled on January 26, 2015, to address his continued employment. Before the vote, Dr. Bharadwaj, who was represented by counsel, offered to resign. Dr. Bharadwaj's wife, Savitha, remains a partner physician and chair of the Internal Medicine Department at the clinic.

Mid Dakota Clinic ("MDC") is a North Dakota Professional Corporation, governed by its bylaws and the North Dakota Business Corporations Act (N.D.C.C. Ch. 10-19.l and N.D.C.C. Ch. 10-31). At the time of Dr. Bharadwaj's resignation, MDC had 50 shareholder physicians and approximately 460 total employees. See Docket No. 109, ¶ 2. A new physician is generally eligible for shareholder status after two (2) years of employment. See Docket No. 113-2, ¶ 6. Pursuant to the bylaws, the shareholders, among other functions, nominate and elect the board of directors; nominate and elect department chairpersons; and terminate the employment of shareholder physicians. Pursuant to the bylaws, the termination of a shareholder physician "may be with or without cause" and requires "the affirmative vote of not less than sixty-seven percent of the outstanding shares." See Docket No. 113-1 § 4.13.

Further, "[a] majority of the entire Board of Directors may at any time, with or without cause, suspend the employment of any shareholder or non-shareholder physician." See Docket No. 113-1, § 4.13(A). Thereafter, the Board "may promptly call a special meeting of the shareholders for the purpose of considering whether or not to terminate the employment of such physician, and, in such a case, the special meeting shall be called for not less than two weeks after the effective date of the suspension." See Docket No. 113-1, § 4.13(A). The Board of Directors at the time of Dr. Bharadwaj's resignation consisted of Dr. Shelly Seifert, President; Dr. Andrew Hetland, Vice President; Dr. Brian Hebert Secretary; Dr. John Botsford, Treasurer; and Dr. Vijay Rao, Member at Large. " See Docket No. 29, ¶ 3. Dr. Bharadwaj was subject to an employment agreement. See

2

Docket No. 113-2. The employment agreement confirms his employment was "at will." See Docket No. 113-2, ¶ 14(B)(4).

Dr. Rao is a hematologist/oncologist, and was the chair of the Oncology Department at MDC. He came to MDC in June 2007, and has been the chair of the Oncology Department since 2009. See Docket No. 106, ¶ 1. Dr. Rao was also raised and educated in India. Dr. Rao testified he could no longer work with Dr. Bharadwaj as his partner in the Oncology Department, and he stated this to the shareholders at the special meeting on January 26, 2015. See Docket No. 113-48.

The record reveals that conflicts developed between Dr. Bharadwaj and his co-workers shortly after he began working at MDC in October of 2010. See Docket No. 113-67, p. 13. On March 1, 2011, Nurse Manager Tracy Kuch sent an email to Mark Dordahl, MDC's COO/Human Resource Manager, stating as follows:

> Mark,
> I have become very concerned with Dr. Jay[1] and his practice. There are a lot of different issues. I have addressed these issues with Dr. Rao with no avail. I had five issues to address before 10 this am. I just received a phone call from a patient today asking to switch. I also had another patient today that is very upset with him. I had complaints from pharmacy also.
>
> Something needs to be done and I don't know who to go to. Cyndi is becoming frustrated with him also. She has been pretty good overall but sees the stuff that is going on with patients and is concerned.

See Docket No. 113-3.

On January 4, 2012, Dr. Rao informed CEO Jeffrey Neuberger "there were some problems between Dr. Jay and the staff." See Docket Nos. 113-4 and 112-1. This led to a January 5, 2012, meeting between CEO Neuberger and Dr. Bharadwaj. See Docket Nos. 113-5 and 112-2. Neuberger informed Dr. Bharadwaj of concerns expressed by nurses about his medical decisions and

---

[1]Dr. Bharadwaj was referred to as "Dr. Jay."

3

communication difficulties. Neuberger informed Nurse Kuch as a result of the conflict in the department that the nursing staff should either file an incident report so that administration could investigate, or say nothing at all. See Docket Nos. 113-4, 113-6, 112-1, and 112-3.

On March 1, 2012, the problems reached the level of the Medical Director at the time, Dr. Robert Roswick. See Docket No. 113-7. Dr. Roswick's discussion with Dr. Bharadwaj centered on ways Dr. Bharadwaj could improve his practice and communication with the nursing staff. The memorandum concluded: "[o]ur meeting was amicable and productive. We will see how Dr. Jay progresses . . ."

On December 11, 2012, due to continued complaints by the nurses about Dr. Bharadwaj, CEO Neuberger and Mark Dordahl met with oncology nurses Tracy Kuch and Dawn Feist. See Docket Nos. 113-11 and 110-1. The memorandum of the meeting, prepared by Dordahl, reads in relevant part as follows:

> . . . The Nursing staff wanted to express their concerns about what they perceive as a relationship with him that continues to deteriorate and to explore ways in which we could improve the situation. When asked about examples they could offer, we discussed the following:
>
> • The Nurses expressed concern about retaliatory type behavior when a mistake is found or an error is perceived throughout the work day. They often feel that Dr. Jay wi ll then look for mistakes that the Nursing staff has made after they have approached him to clarify an order or perhaps change an order that may have been something worth questioning.
>
> • Tracy and Dawn expressed concerns about Dr. Jay's defensiveness. They state that it occurs on a daily basis which makes it very difficult for them to have a good working relationship in the Clinic.
>
> • Dawn related a story in which the pharmacy called for Dr. Jay to verify or create an authorization for a narcotic. It sounds as though there was some confusion and the result was Dr. Jay stating to Dawn "Maybe you should start to learn to take messages correctly." This was not a good method of constructive criticism and she felt like he was very accusatory.

4

• Jeff did state to the Nurses that obviously there is probably some organizational skills lacking in Dr. Jay's daily life and he has probably exhibited some retaliatory behavior , but we wanted to explore where we can go from here.  He emphasized that it is very hard to change one's personality and that it is often better to try and find a method to work well together.

• Tracy agrees that it is beneficial to try to find a better method of working together, but also added that this is impacting the other Nursing staff.  She states that Brittany Nelson has been suffering chest pain lately and has had bouts of anxiety and hives from working in the Department.  She also states that Kathy Rembolt who has been employed with Dr. Thomas for nearly 30 years says that she will not work for Dr. Jay.  She also stated that if we lose Dawn in the practice we will be moving on to Dr. Jay's fourth Nurse since his arrival here.

The plan for the future will be that Jeff will go and speak with Dr. Jay near the end of the week and see if we can improve upon the situation.  We will continue to monitor.

See Docket No. 113-11.

On June 3, 2013, Nurse Kuch reported to Dordahl about an argument that occurred between Dr. Bharadwaj, Dr. Rao and Dr. Rao's nurse.  See Docket No. 113-12.  Dr. Bharadwaj accused Dr. Rao and his nurse of "stealing his patients."  Dr. Bharadwaj had confronted Dr. Rao's nurse directly with this allegation.  Nurse Kuch was concerned because she did not believe "the nurses should be pulled into this."  See Docket No. 113-13.  To address the situation, Nurse Kuch sent an email to all of the nurses, and copied Dr. Dordahl, Dr. Bharadwaj and Dr. Rao, which read as follows:

Communication between the two practices is to go through the nurses and not through the doctors.  If you have a concern or complaint please address it with the appropriate nurse and she can then forward it onto the doctor.  Doctors are to do the same and talk to their nurse who can then forward it into the other practice.  According to Achmed, the dead terrorist, "SILENCE".

See Docket No. 113-12.

In his complaint, Dr. Bharadwaj alleges the reference to "Achmed the Dead Terrorist, "SILENCE'" is direct evidence of discrimination.  See Docket No. 1, ¶ 4.  Achmed the Dead Terrorist is a puppet character created by comedian Jeff Dunham.  See Docket No. 113-12.  Dunham

5

had recently performed at the Bismarck Civic Center in Bismarck and a number of the oncology nurses attended the concert. See Docket No. 113-67, pp. 40-41.

On September 5, 2013, the problems in the Oncology Department once again made it to the level of Medical Director. See Docket No. 113-15. The Medical Director at the time was Dr. Steven Hamar. The purpose of the meeting was to address Dr. Bharadwaj's "care, patient complaints and his nurses' care and complaints." Id. Drs. Hamar and Dr. Bharadwaj discussed concerns about patients transferring out of his care, and his reaction to that. Id. Dr. Bharadwaj criticized Dr. Rao for being behind on his charts.[2] Id.

On December 13, 2013, Dr. Hamar met with Dr. Rao and Mark Dordahl to discuss the "working relationship that Tracy Kuch, Nursing Supervisor, and Dr. Jay have with each other in the Oncology Department." See Docket Nos. 113-16 and 110-3

On February 6, 2014, Dr. Hamar was called to the Oncology Department concerning another argument between Drs. Bhardwaj and Rao. See Docket Nos. 113-17 and 113-18. Dr. Hamar had received an incident report filed by Dr. Bharadwaj complaining that Dr. Rao was seeing all of Dr. Luebke's patients when he was out on medical leave. Id. Dr. Bharadwaj later filed an incident report claiming CADD pumps were not available, and blamed this on the nurses. Id. Dr. Bharadwaj demanded that the nurses remove one of Dr. Rao's patients from one of Dr. Luebke's exam rooms. Id. Dr. Hamar was called when "the two [Drs. Bharadwaj and Rao] were very vocally discussing this in the hallway where the patients could hear as well as staff." See Docket Nos. 113-18 and 110-5. Dr. Hamar stated that "[t]he nurses have had enough." See Docket No. 113-17. He noted as

_____

[2]3 Dr. Rao was fined by the clinic for being behind on his charting in June of 2012. See Docket No. 113-9.1 Dr. Bharadwaj's complaint about this forms the basis for Dr. Bharadwaj's claim of "Medicare fraud" under the False Claims Act. See Docket Nos. 1; 113-61, pp. 47; 122-123; 146; and 147.

follows:

> My concern is that Dr. Jay is becoming more and more paranoid about what is going on with his practice and becoming more and more confrontational, not only with the nursing staff, but now with Dr. Rao and who knows what is going to happen with Dr. Luebke and with the nursing staff. I have some real reservations and concerns about his behavior. I am not aware that there is any medical judgments being jeopardized, but certainly personal judgments are a real problem here. When I walk out of the room, I could see the sort of panic in the nurses' eyes that had told us about the problem and I am thinking she was fearing retaliation but I can't say that for certain. This has got to be an uncomfortable work environment for them.

> As far as resolving this problem long-term I think this is going to be problematic. I think Dr. Jay needs some professional help, I am not certain that he is going to welcome that idea at all. Complicating the whole problem is Dr. Savitha Bharadwaj is his wife and I am not sure how their relationship is going or what she is seeing. I have not talked with her about this at all.

See Docket No. 113-17.

Mark Dordahl's description of the events is contained in his memorandum of the same meeting. See Docket Nos. 113-19 and 110-6. Dordahl followed up with Dr. Bharadwaj on February 7, 2014, and documented that conversation. Dordahl noted that Dr. Bharadwaj "alludes to the fact that he thinks people tell stories or tell lies about him. This seems to be a recurring pattern for Dr. Jay . . . ." Id.

On February 10, 2014, Dr. Hamar and Dordahl met with Dr. Bharadwaj to discuss ways to improve his interaction with the other members of the Oncology Department. See Docket Nos. 113-20, 113-21, 113-22 and 110-7. Dr. Hamar described the meeting as follows:

> . . . I reviewed the events of the past several months and my concern about his practice , and about the way things were going in the Oncology Department particularly with his partners. My concerns about his paranoia with charts, patients and numbers of patients being seen were addressed. During this time Dr. Jay kept trying to refer back to older issues, but I kept trying to tell him we are trying to move forward . I tried to make it clear to him that my goal was to assist him in bettering himself, his practice, his department and that my concern was that things had deteriorated now to the point where even Dr. Rao was not being supportive.

> I did discuss with him that it is time to look at ways of improving this situation and that it is not everybody else that it is him that is creating this problem, and we need to try to remedy this situation. I have suggested the Vanderbilt Program to him. I have had success with that in the past. I told him at this point this was a voluntary evaluation and done confidentially, but it would require information that we have available, complaints and those sorts of things that would have to be forwarded on....

See Docket No. 113-21. Mark Dordahl's description of the conversation is contained in Docket No. 113-22 and 110-7. In his description, he notes that Dr. Bharadwaj accused "nursing staff and Dr. Rao [of] 'telling stories and lies about me.'" Id. Dr. Bharadwaj also complained about Dr. Rao stating "Dr. Rao didn't do his charts for six months." Id.

The "Vanderbilt Program" referenced by Dr. Hamar was the Vanderbilt Comprehensive Assessment Program offered by the Department of Psychiatry at Vanderbilt University Medical Center. Dr. Bharadwaj agreed to attend the program from February 26-28, 2014. The report notes in relevant part that

> Dr. Bharadwaj was referred to VCAP for evaluation by Dr. Steven Hamar, chief medical officer of Mid-Dakota Clinic in Bismarck, N D. Dr. Bharadwaj's referral was prompted due to disruptive behavior, staff and patient complaints, and concerns that his behavior was increasingly paranoid in nature.
>
> . . .
>
> Consistent with reports from Mid-Dakota Clinic, Dr. Bharadwaj had an extremely difficult time identifying any role he had played in communication problems in his clinic. He persistently deflected focus from himself to others, pointing out others' deficiencies, pre-existing problems at the clinic, and blaming others, particularly the nurse manager.

See Docket No. 113-24. Dr. Bharadwaj refused to provide authorizations for his evaluators to speak to any of the clinic nurses, Tracy Kuch or Dr. Rao. See Docket No. 113-23, p. 1. He provided an authorization to allow them to speak to Mark Dordahl, but he conditioned the authorization as being effective for one day only, and that he be allowed to listen to the interview on speakerphone. Id. at 7. His evaluator noted:

> Dr. Bharadwaj was unable to sit quietly during the telephone call. He frequently interrupted Mr. Dordahl, attempting in some cases to argue specifics about a complaint, and at one point, the conversation had to be redirected. Dr. Bharadwaj made it a point during the call to verify the problems that Dr. Rao had with delinquent documentation, and the termination of one of the clinic nurses in the past. He was observed to have difficulty focusing on his personal role in the clinic issues.

See Docket No. 113-23, p. 8. Based on the evaluation, including significant psychological testing, Vanderbilt recommended the following:

> 1. We have concern that Dr. Bharadwaj's paranoid stance is insufficiently understood and that without intervention may continue to escalate, calling into question his fitness to practice.

> 2. We recommend that Dr. Bharadwaj complete a brief treatment intensive at a facility experienced in managing distressed physicians. We suggest Acumen Institute in Lawrence, KS, . . . . An intensive treatment is necessary due to limitations on this evaluation created by Dr. Bharadwaj's defensiveness in interviews and testing and reluctance to allow us to make some collateral contacts.

See Docket No. 113-23, p. 14.

The record reveals that Dr. Bharadwaj never mentioned racial discrimination or disability discrimination as a cause of his problems at the clinic while he was attending the Vanderbilt Program. See Docket Nos. 113-23 and 113-24. He also did not attribute his problems to retaliation for any reports of fraudulent or illegal activity.

Dr. Hamar received the Vanderbilt Program summary report in early April, 2014. See Docket No. 113-23. A meeting was scheduled on April 10, 2014, between Dr. Hamar, Medical Director Dr. Tanous, and Dr. Bharadwaj to discuss Vanderbilt's recommendations. See Docket No. 113-25. Dr. Bharadwaj was asked to attend the meeting by himself but he insisted that his wife also attend. The participants discussed Vanderbilt's recommendation that Dr. Bharadwaj obtain treatment from the Acumen program, and it was conveyed that this was the "expectation of Mid Dakota Clinic." Id.

On July 7-10, 2014, Dr. Bharadwaj attended Acumen's "Professionalism, Leadership and Collaborative, Non-Disruptive Communication in the Medical Team Environment Program." See Docket No. 113-26. The intensive "Longitudinal Day Treatment and Coaching Program" recommended by Vanderbilt began with a three-week "Immersion and Redirection" program. Id. On July 30, 2014, Dr. Tanous sent Dr. Bharadwaj a letter stating that "[t]his 2 1/2 day seminar; however, does not meet the MDC Board of Directors criteria for fulfillment of your obligation. Please make appropriate arrangements to Acumen Institute for their Longitudinal Day Treatment & Coaching Program." Id.

On August 18, 2014, Nurse Kuch emailed Nursing Director Rebecca Bush informing her that Dr. Bharadwaj refused to cooperate with her on the implementation of the Nurse Navigator program. See Docket No. 113-27. On September 24, 2014, Bush sent a "high-importance" email to Dr. Tanous, Lein and Dordahl informing them that Kuch informed her the "entire infusion staff is ready to walk out." See Docket No. 113-29. The staff "informed Dr. Rao that they do not feel safe taking care of Dr. Jay's patients. The nurses feel they have a target on their backs, they feel he is watching every move they make hoping for mistakes and that he going to report them to the [Board of Nursing] for unnecessary reasons." Id.

On October 20, 2014, Dr. Tanous received another complaint from the nurses regarding confusion of orders received from Dr. Bharadwaj. See Docket No. 113-33. Dr. Tanous noted continuing communication difficulties between Dr. Bharadwaj and the remainder of the nursing staff, and he recommended "discussion within the department on trying to solve the communication issues to hopefully improve patient care and treatment." See Docket Nos. 113-33 and 113-65.

From October 27, 2014, to November 14, 2014, Dr. Bharadwaj voluntarily attended Phase I of the Acumen intensive program, and was absent from the clinic.

10

On October 28, 2014, Dr. Tanous scheduled a meeting of the Oncology Department, including Drs. Luebke and Rao, the nursing and chemotherapy staff, and the receptionist. See Docket No. 113-34. The following is Dr. Tanous' summary of that meeting:

High concern regarding Dr. Jay's behavior.

This meeting was scheduled on behalf of the nurses in regards to significant issues with Dr. Jay's behavior. The nurses have indicated they are having great difficulty in working with Dr. Jay. This includes a significant amount of paranoia which makes conversation and day to day activities very difficult. The nurses also indicate that they feel they are being closely watched for any types of errors thus possible unnecessary reporting may occur.

What is most concerning to the nursing staff is they are having problems with communication with Dr. Jay. They feel any type of discrepancy between orders or other issues the direct conversation with the physician is now impaired.

Finally the nurses, receptionists have indicated that they cannot work in this type of environment, they have labeled this environment as hostile and feel that working here with the Oncologist of question, Dr. Jay, is threatening to their well- being. I ended the discussion indicating that information will be reviewed as well as processed and there are hopes of a resolution to this situation in the near future.

See Docket No. 113-34.

On October 29, 2014, Dr. Tanous received a call from Dr. Peter Graham of the Acumen Institute. See Docket No. 113-35. Dr. Tanous informed Dr. Graham that "there are many concerns in our Clinic in regards to strange and unusual behaviors observed by Dr. Jay." Id. Dr. Tanous also noted there is "also some concern regarding the possibility of paranoia behavior and possible mental impairment." Id.

In light of the concerns raised by the nursing staff, Dr. Tanous instructed Compliance Officer Pam Crawford and Nursing Director Rebecca Bush to meet with the staff of the Oncology Department. The meeting was held on November 4, 2014, and was documented in a memorandum authored by Pam Crawford which states in relevant part as follows:

11

On November 4th Rebecca Bush and I met with the Oncology nursing staff as requested by Dr. Tanous.

The purpose of the meeting was to assess the work environment, specifically related to their work with Dr. J. Bharadwaj.

We met with the staff for approximately one hour. In summary, the staff do not want to work with Dr. Bharadwaj. The staff expressed concerns for themselves, the patients, and many feel their nursing licenses could be in jeopardy if they continue to work with him because of threats made by him.

The following is a summary of the concerns expressed by the staff.

Concerns

1. Reported behaviors.

   a. Nurses report Dr. Bharadwaj "stalks" them-examples include following them around at work, listening to their conversations with others, leaving notes where they will be seen by them.

   b. It was reported that on several occasions when the nurses ask him a question or try to discuss an issue, he puts up a hand close to their faces and tells them to stop talking or just walks away.

   c. Nurses are afraid to ask Dr. Bharadwaj for clarification of medication orders or ask treatment-related questions. This has the potential to result in compromised patient care, especially since he hand-writes many orders.

   d. He is bypassing the nurse scheduling process with patients, then accuses and blames the nurses for any miscommunications. . . .

   e. The nurses used terms describing Dr. Bharadwaj's behavior towards them as being disrespectful, abusive, paranoid, harassing, passive-aggressive, demeaning, rude, and mean. It has created a stressful work environment - hindering team work, team effectiveness, and communication. The staff provided specific examples of patient care incidents they believed occurred because of the lack of communication.

2. Nursing staff job satisfaction, personal issues.

   a. Almost every person in the meeting volunteered that they were on medication because of the stress and anxiety they are experiencing at

12

work.

b.     The nurses are extremely angry that this situation has been allowed to continue in spite of their numerous complaints to various clinic personnel.  They have given serious consideration to taking this situation to an outside source because of what they view as lack of concern or action by the clinic.  They are fearful of doing so because of retaliation concerns.  However, several of them indicated they may consider outside reporting, especially if they leave employment with the clinic.

c.     One nurse has hired an attorney because of threats made by Dr. Bharadwaj to affect her nursing license.

3.     Compromised patient confidentiality.

Dr. Bharadwaj discusses medical care with patients in the reception area where other patients and general public are present.

4.     Community Impact.

Dr. Bharadwaj refuses to cooperate and participate with the Nurse Navigator as required for the Community Commission of Cancer Accreditation . . . .

5.     Patient care concerns.

a.     Dr. Bharadwaj does not want his patients to be seen when he is away from the clinic, regardless of the length of time. This has the potential to affect the effectiveness of chemo treatment.

b.     Dr. Bharadwaj does not generally enter patient treatment medication orders/plans into the electronic record but rather hand-writes them on paper. He has at times  lost those paper orders and then blames the nurses for not administering medication as ordered.

c.     Patients are often confused because Dr. Bharadwaj does not always inform them when their treatment will be changing . . .. Apparently he then places blame on the nurses when patients ask about the differences or changes.

d.     Patients have stated to the nurses that Dr. Bharadwaj is rude . . . .

Summary

I'm not convinced that the nursing staff will remain at the Clinic even if Dr.

13

> Bharadwaj's behavior improves because the working relationships have been damaged probably beyond repair. It may also be very difficult to recruit and retain replacement quality staff. I believe the staff is at the point where they may report the situation outside of the clinic (for example, the State Labor Department or the federal EEOC) if they do not get help and support.
>
> The work environment is very stressful and tense - hindering team work, team effectiveness, and communication. This has the potential to result in detrimental patient care . . . .

See Docket No. 113-36. This memorandum was subsequently provided to Dr. Graham at the Acumen Institute, who provided it to Dr. Bharadwaj. See Docket No. 114-19, ¶ 8.

On November 17, 2014, Dr. Tanous made a presentation to the Board of Directors regarding Dr. Bharadwaj's status. See Docket No. 113-37. He shared with the Board Pam Crawford's memorandum, stated the "Oncology Nursing Staff has filed a formal complaint about Dr. Jay's conduct." Dr. Tanous framed the issues to be decided by the Board as follows:

4.    Foremost Questions for the Board of Directors:

a.    How to handle this potential hostile work environment?

- Suspension from clinic until details of staff and administration can be deliberated-Input from Pam Crawford / Mike Waller

- Roundtable discussion with nursing staff and Dr. Jay to develop healthier work environment

- Other options/recommendations??

Id. The Board decided a roundtable discussion with all oncology nurses and physicians was appropriate. See Docket No. 113-38. Dr. Tanous sent an email invite on November 18, 2014, to all attendees. Id. On November 20, 2014, at 9:00 a.m. Dr. Bharadwaj responded to the invite as follows: "Hi Bob: The allegations and patient care issues are false allegations." See Docket No. 113-39.

14

After receiving this email, Dr. Tanous emailed the Acumen Institute's Dr. Graham stating: "I was hoping to have received your report on Dr. Jay by now. If you could email to me or fax this today, that would be great." See Docket No. 113-40, p. 2. Dr. Graham replied that he would get something out "no later than tomorrow morning," and apologized for the delay. Id. at p. 1. In the email, Dr. Graham stated:

> ...I would remind you that we saw no psychiatric reason why he shouldn't be in the workplace. Clearly there are aspects of his style of working with others that require ongoing attention and support. His communication and renewed collaboration with his team will need formal remediation with the emphasis on 'mediated' communication to help him get across to everyone that he comes back with a very different mindset and set of intentions for working with them.

Id. This email was forwarded to the Board of Directors.

Dr. Bharadwaj's nurse, Linda Neff, described Dr. Bharadwaj upon his return from Acumen:

> Q.  [BY MR. MADIA] All right. I want to talk to you about that time when he came back for that little while. So he was gone for a few weeks, he came back and then he was gone again, so that period when he was back. What do you remember about him during that time period, if anything?
>
> A.  Seemed more paranoid. Was frequently pulling both of us into the room and telling us to watch out for this person and that person. They would make sure we would get fired, especially Tracy, you know, being the manager, that we were always -- he was always telling us, Watch out, you're going to get fired, that kind of --

See Docket No. 113-73, p. 22. Dr. Tanous explained:

> A.  November 20 he had sent this e-mail to me which -- which essentially told me that he did not seem to comment or respond, and basically just thought everything that I brought -- sent to him was -- was false.
>
> A.  So the problem was you have an oncology department that is unable to work efficiently. They cannot handle care, they cannot take care of patients. I cannot have half the staff wanting to leave. The oncologists are having issues. This was the problem that returned.
>
> . . .
>
> Dr. Jay had an opportunity to -- to follow a path that was in the process of good-faith rehabilitation. He did not follow that path when he returned.

15

. . .

A.  Came back to the clinic and the attitude and the behavior that his fellow oncologists and staff had seen was the same type of behavior that they saw prior to his leaving.  Same type of attitude that he had when he returned from July's evaluation.  Whether I talked to Dr. Jay or not, it didn't change his behavior that had occurred when he came back to the clinic.

See Docket No. 113-65, pp. 108-111 and 52-53.

Dr. Graham's formal report was submitted to Dr. Tanous on November 21, 2014. See Docket No. 113-41. One of the recommendations was holding a "facilitated meeting with Dr. Jay and the nurses, including Ms. Kuch as their supervisor, so that Dr. Jay can make his current attitude approach, and intentions clear to everyone, so that they know he is quite serious about changing his work presence and style of communication for the better over the next year's progress and beyond." Id.

On November 21, 2014, the Board decided to suspend Dr. Bharadwaj's employment, with pay and benefits. See Docket No. 113-42. The letter informing Dr. Bharadwaj was signed by Dr. Shelly Seifert, Board President. Id. The letter was hand-delivered to Dr. Bharadwaj by Dr. Tanous and CEO Lein. See Docket No. 113-43.

On December 5, 2014, Dr. Bharadwaj filed a complaint with the North Dakota Department of Labor. See Docket No. 114-7. 50. The complaint detailed several of the disputes discussed above, which he referred to as "harassment." Id. He also referenced to Dr. Rao's "delinquent encounters" and alleges he reported this to Dr. Hamar and Marvin Lein. The complaint was entitled "reporting retaliation" and states "I hereby charge Dr. Vijay Rao, Nurse Manager Tracy Kuch, and Mid Dakota Clinic, PC of falsely accusing me, and suspending me in retaliation under N.D.C.C. 34-01-20." Id. Dr. Bharadwaj never mentioned racial discrimination or disability discrimination in his complaint to the North Dakota Department of Labor.

On December 17, 2014, Sheena Cole of the Labor Department sent Dr. Bharadwaj an email asking him to clarify his complaint. See Docket No. 114-8. For the first time, Dr. Bharadwaj mentioned: "She [Kuch] expressed racial intolerance by communicating with racial slurs such as 'Achmed , the dead terrorist , SILENCE.'" Id. He also stated "MDC illegally perceived me to be mentally unstable to practice medicine, not only refused to accommodate per ADA but actually made worse by forcing me to take consensus with Dr. Rao (who refused), while other departments were allowed individual practice . . . ." Id. In the final charge submitted to the Labor Department, Dr. Bharadwaj alleged discrimination but made no reference of any retaliation for the reporting of illegal activity. See Docket No. 113-50 and 113-61, pp. 276-77.

On January 6, 2015, Dr. Bharadwaj was notified by Board President Seifert that his continued employment would be addressed at a special shareholders meeting on January 26, 2015. See Docket No. 113-44. The special shareholders' meeting was held on January 26, 2015, at the Radisson Inn in Bismarck. The meeting began with Board President Seifert outlining the Board's concerns and the process that "had been going on for well over a year and included the previous medical director." Id. Pam Crawford outlined the staff concerns she documented in her November 4, 2014, meetings with the oncology nursing staff. Drs. Luebke and Rao also spoke and expressed "their concerns the department could not continue as [a] group with Dr. Jay present. There is a level of mistrust, in addition to an inability to communicate collegially in the care of patients." Id. An outline of the presentations made was captured in a memo that states as follows:

1. Introduction - Dr. Seifert, President

    a. Dr. J is currently suspended for reasons brought forth tonight.

    b. BOD, Administration, Medical Director and outside professionals have been engaged over an intensive period of more than one year in an effort to address issues; regrettably the efforts have not corrected the issues to be

17

presented tonight.

c. BOD does not enter into this discussion lightly or without due consideration of the impact on the Dr. J's practice.·

d. BOD enters into this discussion as a matter of protecting and enhancing our Clinic's practice reputation, work environment, peer collegiality, department practice standards and BOD-directed process in attempts to support positive change and retention.

2. Dr J's Presentation -1egal and/or Dr. J·

3. Practice Reputation - Marvin J. Lein, CEO

    a.    Reports of community physicians redirecting patients to someone other than Dr. J because of poor patient interaction skills (refusing to answer patient questions, curt and one-sided interactions with patient families). We expect better from everyone in our organization.

    b.    Reports of Sanford physicians receiving follow-up on-going care transfers of Dr. J's. One noted a good portion of her practice has been former Dr. J patients. "We see a lot of his patient." This is a significant disruption to patients and reflects poorly on the entire Clinic.

    c.    The extraordinary demand for Hem/Onc services with modest supply is a frustrating experience for patients to begin with. When that experience is further hampered by the perception of poor patient skills, the patient experience suffers exponentially. And our reputation suffers exponentially.

4. Staff Work Environment unhealthy Pam Crawford

    a.    Staff report repeated need to clarify orders, seek orders not fully recorded in the chart and other necessary additional communications not experienced with other physicians to the point of nursing staff becoming concerned that they may be party to an adverse clinical event.

    b.    Staff report attempts to improve communication are frequently met with outright refusal to discuss concerns. Changes in nursing support did not correct the situation.

    c.    The entire infusion nursing team have advised administration that Dr. J's return would compel them to seek employment elsewhere, as the

18

environment is too risky and unhealthy with his presence.

d.     Two nurses have had a patient complaint filed against them with the Board of Nursing concerning the experience of a patient of Dr. J's. Each engaged legal counsel to address. Allegations were dismissed but the perception is that Dr. J's return do to the above will expose them to further complaints and allegations against their licenses.

See Docket No. 113-47.

Dr. Bharadwaj's lawyer, Nikhil Joshi also spoke at the meeting. Mr. Joshi asserted his client had not had adequate time to correct his behavior between his return from the Acumen Institute and his suspension. Dr. Bharadwaj spoke next. See Docket Nos. 113-65, pp. 136, 142-44 and 107, ¶ 5. He essentially asserted the fault for the problems in the Oncology Department were not his but were the fault of the rest of the department. See Docket No. 113-65. Finally, Dr. Tanous refuted the allegation that Dr. Bharadwaj did not have enough time and "pointed out continued poor behavior on Dr. Jay's part after returning from the evaluations." See Docket No. 113-48. Eventually a motion was made and seconded to terminate Dr. Bharadwaj. Id.

Dr. Bharadwaj's attorney asked for a break to confer with MDC counsel Michael Waller. See Docket No. 107, ¶ 7. The record reveals that Waller, Joshi and Dr. Bharadwaj exited the room and went into the hallway. Id. at ¶ 8. Attorney Joshi asked if the vote would proceed if Dr. Bharadwaj would resign. Id. Waller said he felt there would be no need for the vote if Dr. Bharadwaj resigned. Id. Joshi then said Dr. Bharadwaj would resign, and Waller believes he confirmed that with Dr. Bharadwaj. Id. at ¶ 10. Upon returning to the meeting room, the motion was withdrawn and the shareholders were informed Dr. Bharadwaj had resigned. Id. Dr. Bharadwaj confirmed his resignation by a letter dated February 17, 2015. See Docket No. 113-49.

19

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  The court must consider the substantive standard of proof when ruling on a motion for summary judgment.  Anderson, 477 U.S. at 252.

## III.   LEGAL DISCUSSION

### A.    TITLE VII RACE AND NATIONAL ORIGIN DISCRIMINATION

In a Title VII discrimination claim, "[t]he plaintiff 'retains at all times the ultimate burden of proof and persuasion.'"  Stone v. McGraw Hill Financial, Inc., 856 F.3d 1168, 1174 (8th  Cir.

20

2017) (quoting Onyiah v. St. Cloud State Univ., 684 F.3d 711, 716 (8th Cir. 2012)).  An employee in a discrimination case can survive an employer's motion for summary judgment in one of two ways.  Evance v. Trumann Health Servs., LLC, 719 F.3d 673, 677 (8th Cir. 2013).  The first is to produce "direct evidence of discrimination," which is evidence that  shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Id. (quoting Russell v. City of Kan. City, Mo., 414 F.3d 863, 866 (8th Cir. 2005)).  If there is no direct evidence of discrimination, the plaintiff may establish an inference of discrimination under the burden-shifting framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).

Dr. Bharadwaj has alleged race discrimination and national origin discrimination, and arguably a hostile work environment claim.  "Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Stone, 856 F.3d at  1175 (quoting Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003)).

> To establish a Title VII race-based hostile work environment claim, a plaintiff must show that: (1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment.

Id. (quoting Singletary v. Mo. Dept. of Corrs., 423 F.3d  886, 892 (8th Cir. 2005)).

Direct evidence of discrimination is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  Thomas

21

v. First Nat'l Bank of Wynne, 111 F.3d 64. 66 (8th Cir.1997). "Direct evidence does not include statements by decisionmakers that are facially and contextually neutral." Torgerson v. City of Rochester, 643 F.3d 1031, 1045 (8th Cir. 201 1) (citing Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006)).

Dr. Bharadwaj's complaint to the North Dakota Department of Labor never directly or indirectly mentioned claims of racial discrimination or any claims even remotely related. See Docket No. 114-15. During Dr. Bharadwaj's deposition he was asked about the allegation in his complaint that he "received racial epithets and taunting from staff." See Docket No. 113-61, pp. 38-61. Dr. Bharadwaj said that a nurse named Barbara Duncan called him a "terrorist" "probably two, three times." See Docket No. 113-61, p. 39. He could not remember the context in which those statements were made. See Docket No. 113-61, pp. 39-40. He said Nurse Duncan also said that "[he's] a slave to Dr. Rao. I cover him whenever he the leaves the department without telling anybody." See Docket No. 113-61, pp. 39-40. Duncan was terminated from the clinic in September of 2012, because according to Dr. Bharadwaj "she was very rude to the patients, she was rude to the doctors . . ." See Docket No. 113-61, p. 42. He stated Nurse Kuch referred to him as "Achmed the Dead Terrorist" "at least three times." See Docket No. 113-61, pp. 48-49. According to the deposition of Dr. Bharadwaj, these three instances occurred from 2010-2013. Id. at pp. 56-59. Dr. Bharadwaj also said patients told him Nurse Kuch told them he was difficult to understand because he "speaks Hindu." See Docket No. 113-61, pp. 60-61. Dr. Bharadwaj admitted Nurse Kuch never said that to him directly. See Docket No. 113-61, pp. 60-61.

The Court finds that Dr. Bharadwaj has failed to present any direct evidence of racial discrimination by any decision-makers at Mid Dakota Clinic. Even assuming for the sake of argument that a reference by a clinic nurse to a puppet of middle-eastern descent, and hearsay

22

references to "speaking Hindu," constitute direct evidence of discrimination, these are the types of "stray remarks" by non-decisionmakers that Courts routinely reject. It is well-established that "stray remarks in the workplace" and "statements made by non-decisionmakers" do not constitute direct evidence. Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir. 2014). Dr. Rao, the individual whom Dr. Bharadwaj focused a great deal of the blame for his employment problems, is the same race as the plaintiff. When asked about this in his deposition, Dr. Bharadwaj stated as follows:

> Q: Do you believe Dr. Rao has racially discriminated against you?

> A: Not racially. Nationally, linguistically and the way we got into medical school. I was a merit student; he was a donation student, as he told. He paid money to become a doctor. He had to make more money.

> Q: Okay.

> A: And I am from different caste. I am a vegetarian; he is not a vegetarian. I refused to get foods from the drug -- food from drug representatives to get it from his business, I think it is called QDOBA ....

See Docket No. 113-61, pp. 253-254. The Court finds the record is devoid of any direct evidence of racial discrimination by decision-makers at the clinic to support the claims of race or national origin discrimination.

The Court must undertake the burden shifting analysis under *McDonnell Douglas*. A prima facie case of race and national origin discrimination requires the plaintiff to demonstrate 1) that he is a member of a protected class, 2) that he was meeting his employer's legitimate job expectations, 3) that he suffered an adverse employment action, and 4) that similarly situated employees outside the protected class were treated differently. Smith v. URS Corp., 803 F.3d 964, 696 (8th Cir. 2015); see Robinson v. Am. Red Cross, 753 F.3d 749, 754 (8th Cir. 2014). The record reveals the Defendants have acknowledged that Dr. Bharadwaj's east Indian descent establishes the first prong of the test.

The "analysis of an employer's legitimate expectations does not merely consider whether a plaintiffs actual job performance was satisfactory - it is a much broader analysis, which allows fact-finders to consider factors such as insubordination and work place camaraderie." Zayas v. Rockford Memorial Hosp., 740 F.3d 1154, 1 158 (7th Cir. 2014) (citing Fane v. Locke Reynolds, LLP, 480 F.3d 534, 540 (7th Cir. 2007)).  The Eighth Circuit Court of Appeals has held that an employee was not meeting his employer's legitimate job expectations where he received unfavorable evaluations and failed to cure his serious and repeated performance deficiencies after being given months to improve.  Shanklin v. Fitzgerald, 397 F.3d 596, 602-03 (8th  Cir. 2005).  Suffice it to say the record reveals more than sufficient evidence of Dr. Bharadwaj's insubordination and defiant behavior to adequately show Dr. Bharadwaj was not meeting MDC's legitimate job expectations. The workplace had been plagued with dysfunction and displeasure for which Dr. Bharadwaj must bear some responsibility.  A careful and objective review of the entire record easily leads to that conclusion.  It is also clear and undisputed that Dr. Bharadwaj voluntarily resigned before a vote was held on his termination on January 26, 2015.  See Docket No. 107, ¶ 10.

"To prove a constructive discharge, an employee must show that the  employer deliberately created intolerable working conditions with the intention of forcing [him] to quit."  Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 418 (8th Cir.2010).  "The standard is an objective one.  'An employee may not be unreasonably sensitive to [his] working environment.  A constructive discharge arises only when a reasonable person would find [his] working conditions intolerable.'"  West v . Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995) (quoting Johnson  v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981)).  It is well-established in the Eighth Circuit that a general feeling of being unfairly criticized , unfavorable performance evaluations , criticism and reprimands for  an employee's conduct, or unpleasant  working conditions "are insufficient to

24

constitute a constructive discharge." Tatom v. Georgia-Pacific Corp., 228 F.3d 926, 932 (8th Cir. 2000) (citations omitted). More important, a recommendation for termination or a threat of termination is not an adverse employment action. Weisbecker v. Sayville Union Free Sch. Dist., 890 F. Supp. 2d 215, 234 (E.D.N.Y. 2012).

> At his deposition, Dr. Bharadwaj explained the reasons for his decision to resign:
>
> Q. Okay. Why did you resign?
>
> A. You know, I did my duty in utmost good faith, and I attended that meeting with the same belief, that the right thing will happen. I listened to what was told. They were outright lies. I knew they were lies. They knew I was - I knew they were lies and they knew they are lying.
>
> And the e-mail that was sent for this termination meeting also said if any shareholder does not – approximately , its not verbatim -- anybody who does not give a proxy or attend the meeting to vote is considered to have acted against the board decision.[3] Dr. Kavlie also suggested my license would be in jeopardy if they terminate me, which would cause further domino effect, including my professional personal career, life, et cetera.
>
> After saying all the things my attorney and I discussed and the ballot was distributed to everyone who was there, including Dr. -- I mean I don't -- I don't know about including -- Dr. Luebke was not even a shareholder and he was there. So I decided that I will constructively discharge and resign.

See Docket No. 113-61, pp. 260-261.

The Court finds, and the record clearly establishes, that Dr. Bharadwaj resigned because he feared the repercussions of being terminated , and he assumed the shareholders' vote at the meeting on January 26, 2015, would not go his way. The Court concludes as a matter of law that this scenario does not equate with the "intolerable working conditions" necessary to meet the standard for constructive discharge.

---

[3] The email notifying shareholders of the special meeting says that failure to attend the meeting or designate a proxy "is generally like voting against any proposed measure." See Docket No. 113-45.

Further, the only information provided by Dr. Bharadwaj as to physicians he claims were "similarly situated" was provided by Dr. Roswick in his deposition. Dr. Roswick named five physicians who, in his opinion, were treated differently than Dr. Bharadwaj. See Docket No. 71, pp. 44, 19, 49, 51 -53. As to one of these physicians, the clinic has no record of disciplinary action. See Docket No. 109, ¶ 3. The conduct of the others was addressed by different medical directors, different board members, and none exhibited Dr. Bharadwaj's unwillingness to change. See Docket Nos. 109-1, 109-2, 109-3, and 109-4. Dr. Hamar confirmed that no one during his tenure was similarly situated to the Dr. Bharadwaj. See Docket No. 111, ¶ 7. Dr. Roswick admitted that no one who was terminated or subject to discipline at the clinic in his memory had lost the support of all of the shareholders in their department. See Docket No. 113-71 pp. 100-01. The Court finds that the Plaintiff has failed to sustain his burden to establish a prima facie case of race or national origin discrimination.

Nevertheless, the event Dr. Bharadwaj could establish all of the elements of a prima facie case, then the burden shifts to the Defendant's to articulate a legitimate, non-discriminatory reason for the adverse employment action. Stone, 856 F.3d at 1174. It is well-established that performance deficiencies constitute a legitimate, non-discriminatory basis for an employment action. Id. The Eighth Circuit has "repeatedly held that insubordination and violation of company policy are legitimate reasons for termination." Putman v. Unity Health Sys., 348 F.3d 732, 736 (8th Cir. 2003) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999)). It is clear that an inability to get along with co-workers constitutes a legitimate non-discriminatory reason for discharge. Etukakpan v. St. Jude Med., Inc., 13 Fed. App'x 477, 478-81 (8th Cir. 2001 ).

The Court expressly finds that the record is replete with more than sufficient evidence to show Mid Dakota Clinic had a legitimate, non-discriminatory basis for taking disciplinary action

26

against Dr. Bharadwaj. Under *McDonnell Douglas*, the burden then shifts back to the plaintiff to demonstrate that the proffered reasons for any adverse employment action were merely a pretext for discrimination.

"A plaintiff generally may show that a proffered justification is pretextual in two ways." Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014) (citing Fitzgerald v. Action, Inc., 521 F.3d 867, 873 (8th Cir. 2008)). "First, a plaintiff may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that the explanation is unworthy of credence." Id. "Second, a plaintiff may show that the employer's proffered explanation was not the true reason for the action, but rather that the impermissible motive more likely motivated the employer's action." Id. "In either case, the plaintiff 'must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" Id. (quoting Barnhardt v. Open Harvest Coop, 742 F.3d 365, 371 (8th Cir. 2014)). An employee's "attempt to prove pretext requires more substantial evidence than is required to make a prima facie case because evidence of pretext is viewed in light of [an employer's] proffered justification." Id. (citing Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002)). "In order to demonstrate pretext it is insufficient merely to show that the employer's justification was mistaken, but rather an employee must demonstrate that the employer did not honestly believe the proffered justification." Id. at 879 (citing Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1003-04 (8th Cir. 2012)).

The Court finds there has been no relevant, admissible evidence presented to show that any Board member did not strongly believe Dr. Bharadwaj was a negative presence in the Oncology Department. Based on his history and attitude, the record reveals there was a good faith belief that there was little choice but to remove Dr. Bharadwaj from the Oncology Department on January 26, 2015. The Plaintiff has failed to sustain his burden of proof to show pretext. The Court finds

there is a lack of sufficient evidence to show pretext under the circumstances and, as such, summary judgment is warranted on this claim.

### B.     PLAINTIFF'S TITLE VII RETALIATION CLAIM

"To establish a prima facie case of unlawful retaliation, plaintiff must establish that 1) [he] complained of discrimination; 2) defendant took adverse action against [him]; and 3) the adverse action was causally linked  to the complaint of discrimination." Marzec v. Marsh, 990 F.2d 393, 386 (8th Cir. 1993) (citing Martin v. Local 1513 & Dist. 118 of Int'l Ass'n of Machinists & Aerospace Workers, 859 F.2d 581, 585 (8th Cir. 1988)).  In the absence of direct evidence of retaliation , the *McDonnell Douglas* burden-shifting analysis also applies to Title VII retaliation claims. Liles v. C.S. McCrossan, Inc., 851 F.3d 810, 818 (8th Cir. 2017).

Based on the reasons previously outlined above, the Court finds there is no evidence that Dr. Bharadwaj ever complained of racial discrimination until being asked by the North Dakota Department of Labor for clarification, and his response was then a reference to the "Achmed the Dead Terrorist" email from a non-decisionmaker/nurse. See Docket No. 114-16.  The Court further finds that Dr. Bharadwaj has failed to establish that a causal connection between any such complaints and the subsequent employment action.  "In terms of the causal connection, the plaintiff must show that the protected conduct was a 'determinative-not merely motivating-factor in the employer's adverse employment decision.'" Tyler v. Univ. of Ark. Bd. of Trustees, 628 F.3d 980, 985 (8th Cir. 2011) (quoting Van Horn  v. Best Buy Stores, LP, 526 F.3d 1144, 1148 (8th Cir. 2008)).  The Court finds this claim fails as a matter of law for the same reasons as the underlying discrimination claims, namely, Dr. Bharadwaj was not constructively discharged; there were legitimate, non-discriminatory reasons for any actions taken against him by the Clinic, and he cannot

28

establish pretext as a matter of law.

## C.    ADA DISABILITY DISCRIMINATION

The Eighth Circuit Court of Appeals has enumerated the elements needed to establish a prima facie case of disability discrimination:

> (1) he or she is a "disabled" person within the meaning of the ADA; (2) he or she is qualified to perform the essential functions of the job (either with or without reasonable accommodation); and (3) he or she has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises.

Aucutt v. Six Flags Over Mid-Am., Inc., 85 F.3d 1311, 1318 (8th Cir. 1996); Kowitz v. Trinity Health, 839 F.3d 742, 745 (8th Cir. 2016).

The ADA definition of disability is set forth in 42 U.S.C. § 12102(1) as follows:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

The Court finds that the record is devoid of any relevant evidence that Dr. Bharadwaj is "disabled" within the meaning of the ADA. Simply because Dr. Bharadwaj was disciplined and voluntarily chose to resign his position does not equate with a disability under the ADA. More important, it is well-established that personality quirks or character flaws, aberrations, or mannerisms do not equate with a physical impairment or mental impairment. See Brunke v. Goodyear Tire and Rubber Co., 344 F.3d 819, 822 (8th Cir. 2003). Further, the fact that a physician does not get along with other nurses or physicians in a clinic environment does not equate with a

29

disability. In his deposition, Dr. Bharadwaj acknowledged that he does not have a disease or a disability. <u>See</u> Docket No. 113-61, pp. 229-31.

The Court expressly finds the Plaintiff has failed to present any relevant, admissible evidence to establish unlawful discrimination under the ADA. The Court notes that in the "Plaintiff's Response to Defendants' Motion for Summary Judgment" (Docket No. 117, p. 59) there was only 1/2 page and scant argument devoted to this claim. There is a total lack of sufficient evidence to create a genuine issue of material fact to support an ADA disability claim. This claim is subject to summary judgment of dismissal because there are no genuine issues of material fact in dispute and no facts to support a claim of disability.

### D.     FALSE CLAIMS ACT

The Eighth Circuit Court of Appeals has established the elements of a prima facie case of False Claims Act retaliation as follows:

> (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity."

<u>United States ex rel. Miller v. Weston Educ., Inc.,</u> 840 F.3d 494, 505–06 (8th Cir. 2016).

The Court finds that the Plaintiff has failed to establish any specific facts or present relevant information of actual fraud, Medicare fraud, or any type of fraud that would trigger a claim under the False Claims Act for retaliation. The Court further finds that the record is devoid of any relevant, admissible evidence that Dr. Bharadwaj was actually terminated in retaliation for reporting alleged FCA violations. To the contrary, Dr. Bharadwaj voluntarily resigned before a vote was taken by the shareholders on January 26, 2015. The Court finds there are no genuine issues of

material facts in dispute to support a False Claims Act claim, and summary judgment of dismissal is warranted.

### E. BREACH OF FIDUCIARY DUTIES

The undisputed evidence reveals that Dr. Bharadwaj was a shareholder at MDC. The specific terms of his employment were governed by his employment agreement and the bylaws. Dr. Bharadwaj was without question an "at will" employee who could be suspended or terminated by the shareholders with or without cause. Further, Dr. Bharadwaj voluntarily resigned his position on January 26, 2015, and confirmed the resignation on February 17, 2015. See Docket No. 113-49. The Court finds the breach of fiduciary duty claim is devoid of merit. There are no genuine issues of material fact that would allow a jury to return a verdict for the non-moving party on this claim.

## IV. CONCLUSION

The Court has carefully reviewed the entire record and concludes that the Defendants' Motion for Summary Judgment (Docket No. 103) is **GRANTED**. The motion for a hearing (Docket No. 133) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 13th day of June, 2018.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court